T.C. Memo. 2000-133

UNITED STATES TAX COURT

ESTATE OF CAROLYN J. ROGERS, DECEASED, JOHN A. ROGERS, III,
EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE,
Respondent

Docket No. 2796-97.                     Filed April 12, 2000.

David D. Aughtry and Howard W. Neiswender, for petitioner.

Robert W. West, for respondent.

MEMORANDUM OPINION

HAMBLEN, Judge:  Respondent determined a deficiency of

$305,997 in the Federal estate tax of the Estate of Carolyn J.

Rogers (decedent).  After concessions by the parties,[1] the issue

_____

    [1]The parties made the following concessions:  Petitioner did
                                          (continued...)

remaining for decision is the valuation of decedent's qualified and elected real property under section 2032A. There are two questions for determination:

(1) Whether petitioner can value the real property under the provisions of section 2032A(e)(7) or must value the property under section 2032A(e)(8), which requires a determination of whether the leases submitted by petitioner, entered into in 1968 and 1969, are leases of comparable land for the 5 most recent calendar years ending before the date of decedent's death.

---

[1](...continued)
not elect special use valuation for the Morgan tract. The fair market value of the Morgan tract on decedent's date of death was $148,000.

In 1990, decedent's son made distributions totaling $50,000 of decedent's funds to her grandchildren. Of the amount distributed, $25,000 constituted gifts by decedent to three grandchildren of less than $10,000 to each grandchild. These gifts qualify for the annual gift tax exclusion and are not includable in decedent's gross estate. The remaining $25,000 distribution was not an effective gift, and the amount is includable in decedent's gross estate.

In 1991, decedent's son made distributions totaling $27,000 of decedent's funds to her grandchildren. Of the amount distributed, $13,500 constituted gifts by the decedent to three grandchildren in an amount of less than $10,000 to each grandchild. These gifts qualify for the annual gift tax exclusion and are not includable in decedent's gross estate. The remaining $13,500 distribution was not an effective gift, and the amount is includable in decedent's gross estate.

Petitioner reserves the right to deduct additional eligible administrative expenses on the estate tax return for Federal estate tax purposes.

(2) If petitioner can value one or more tracts of the property under section 2032A(e)(7), which of the following valuation procedures applies:

(A) Can petitioner value all of the tracts as section 2032A(e)(7) property, including timberland, standing timber, and pastureland, using the leases submitted by petitioner; or

(B) can petitioner value the timberland and standing timber as section 2032A(e)(7) property, but not the pastureland, using the leases submitted by petitioner; or

(C) can petitioner value only the timberland as section 2032A(e)(7) property, and not the standing timber and pastureland, using the leases submitted by petitioner? The second question requires a determination of whether the leases submitted by petitioner established a rental value: (1) For timberland, standing timber, and pastureland, (2) for timberland and standing timber only, or (3) for timberland only.

The parties have stipulated the following values for the preceding issues (values include both elected property specially valued under section 2032A and nonelected property at fair market value):

(1) If the Court finds that petitioner must use section 2032A(e)(8), the parties agree that the values of decedent's real estate are as follows:

|            |           |
|------------|-----------|
| Egypt      | $112,350  |
| Lanford A  | 709,488   |
| Lanford B  | 194,952   |
| Morgan     | 148,000   |
| Woodward   | 67,640    |
| Patterson  | 195,581   |
|            | 1,428,011 |

(2)(A)  If the Court finds that petitioner may use section 2032A(e)(7) to value all of the tracts elected as section 2032A property, including the timberland, standing timber and pastureland, with reference to the leases submitted by petitioner, the parties agree that the values of decedent's real estate are as follows:

|            |          |
|------------|----------|
| Egypt      | $17,977  |
| Lanford A  | 295,055  |
| Lanford B  | 186,071  |
| Morgan     | 148,000  |
| Woodward   | 17,317   |
| Patterson  | 164,294  |
|            | 828,714  |

(B)  If the Court finds that petitioner may use section 2032A(e)(7) to value the timberland and standing timber elected as section 2032A(e)(7) property, but not the pastureland, with reference to the leases submitted by petitioner, the parties agree that the values of decedent's real estate are as follows:

|            |          |
|------------|----------|
| Egypt      | $17,977  |
| Lanford A  | 312,495  |
| Landford B | 195,045  |
| Morgan     | 148,000  |
| Woodward   | 43,955   |
| Patterson  | 181,609  |
|            | 899,081  |

(C)  If the Court finds that petitioner may use section 2032A(e)(7) to value the timberland elected as section 2032A property, but not the standing timber and pastureland, with reference to the leases submitted by petitioner, the parties agree that the valuations of decedent's real estate are as follows:

| | |
|---|---:|
| Egypt | $104,797 |
| Lanford A | 662,264 |
| Lanford B | 195,045 |
| Morgan | 148,000 |
| Woodward | 77,305 |
| Patterson | 181,609 |
| | 1,369,020 |

(3)  In the event that the pastureland does not qualify for section 2032A(e)(7) valuation, the value of the pastureland for purposes of section 2032A(e)(8) is $350 per acre (less a 15-percent discount for pasture in the Lanford A and Lanford B tracts).

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

This case was submitted fully stipulated without trial pursuant to Rule 122.  The stipulation of facts and the accompanying exhibits are incorporated herein by this reference and are found accordingly.

Decedent died on August 19, 1992, at the age of 83. Petitioner filed a Federal estate tax return on November 17, 1993. At the date of her death, decedent was a resident of Gainesville, Alabama, which is located in Sumter County. She had resided in Gainesville for 67 years.

Decedent left a Last Will and Testament dated February 18, 1983. Decedent's son, John A. Rogers III, was nominated in decedent's will to be the executor of her estate and was appointed executor by the Probate Court of Sumter County in Letters Testamentary dated August 26, 1992.

Decedent was the widow of Barnes A. Rogers, who died on December 26, 1981, a resident of Gainesville, Alabama. They were married for 48 years. Mr. Rogers left a last Will and Testament dated April 27, 1981. Mr. Rogers' will designated that certain farmland and timberland be held in trust for the benefit of decedent (the marital trust). Mr. Rogers' will also provided that decedent would have a general testamentary power of appointment over the corpus of the marital trust. Decedent exercised that power of appointment by appointing all of the property in the marital trust to her only son, John A. Rogers III. The property in the marital trust was properly includable in decedent's gross estate for Federal estate tax purposes.

Petitioner properly elected to value five tracts of the real estate included on the Federal estate tax return under the

provisions of section 2032A. These five tracts of specially valued estate property are collectively referred to as the five estate tracts. The five estate tracts, located in Sumter County, Alabama, are as follows:

| Tract | Valuation Elected |
|-------|-------------------|
| Egypt | 215 acres - land and timber |
| Lanford A | 90 acres - land and timber |
| | 435 acres - land (no timber election) |
| | 190 acres - land (no timber election) |
| | 805 acres - land and timber |
| | 150 acres - pasture |
| Lanford B | 125 acres - pasture |
| Woodward | 40 acres - land and timber |
| | 100 acres - pasture |
| Patterson | 65 acres - pasture |

On the estate tax return, petitioner timely elected and qualified for a "qualified woodland" election pursuant to section 2032A(e)(13) for the following properties:

| Tract | "Qualified Woodland" Election |
|-------|-------------------------------|
| Egypt | 215 acres - land and timber |
| Lanford A | 90 acres - land and timber |
| | 805 acres - land and timber |
| Woodward | 40 acres - land and timber |
| | 100 acres - pasture |

On the estate tax return, petitioner elected to value the land under section 2032A(e)(8). Respondent valued the property at a higher value under section 2032A(e)(8) and ultimately issued a notice of deficiency determining the value of the property at the higher value. Petitioner now seeks to value the property under section 2032A(e)(7). Petitioner may change the valuation

method and value the property under section 2032A(e)(7) if it establishes the annual gross cash rental of comparable land for the 5 calendar years ending before the date of decedent's death within the meaning of section 2032A(e)(7).

In order to satisfy the comparable land requirement under section 2032A(e)(7), on August 31, 1998, petitioner identified seven tracts of land which it asserted were comparable to decedent's lands which are specially valued. In addition, the record contains a copy of a lease on clear land in Sumter County. Petitioner engaged Dr. Harry L. Haney to determine the comparability of the seven tracts of land with the five estate tracts of specially valued land. The record contains detailed descriptions of the seven tracts of land that petitioner asserts are comparable to the five estate tracts in the leases and in Dr. Haney's reports.

Dr. Haney provided both an original and a supplemental report. The parties agree that these reports are accepted as if the author had testified to their contents. Dr. Haney based his opinion on his experience as a forest economist, professor of forest management-economics at the Virginia Polytechnic Institute and State University in Blacksburg, Virginia, and owner of Alabama timberland. Dr. Haney has lectured, taught, and written extensively on the subjects of forestry and is a Registered Forester in the State of Alabama. His graduate degrees include a

master's in forestry economics from Yale University and a doctorate in forestry economics from Yale University. He is frequently asked to advise those in the timber industry in Alabama and across the South in making timber decisions and has been asked to testify as an expert witness in courts and advise governmental agencies, including the U.S. Department of Justice, Tax Division.

Dr. Haney is a native of Choctaw County, Alabama, where he worked in a family timber business. During and after his forestry studies at Auburn University, Dr. Haney worked for several lumber companies in Alabama and Mississippi, where his responsibilities included timber procurement, logging, and evaluation of timberland for purchase in several counties including Sumter County and Pickens County, Alabama. In 1965, he accepted a forest management job with St. Regis Paper Co. (now Champion International) where approximately 92 percent of the land he managed was under long-term leases.

Petitioner gave respondent copies of timber leases relating to the seven tracts of land which it asserted were comparable to the five estate tracts. The tracts and the timber leases relating to each of the tracts are as follows:

| Tract | Date of Lease | Acres | County |
|---|---|---|---|
| Barnes Rogers, et al. | Mar. 1968 | 2,432 | Sumter |
| Barnes Rogers, et al. | Apr. 1968 | 1,056 | Sumter |

| | | | |
|---|---|---|---|
| Richardson | Sept. 1968 | 261 | Pickens |
| Clarence Rogers | Sept. 1969 | 559 | Sumter |
| Clarence Rogers | Sept. 1969 | 489 | Sumter |
| Irwin | Sept. 1968 | 80 | Pickens |
| Hurst | Dec. 1969 | 642 | Fayette |

The 2,432 acres owned by Barnes Rogers, et al., were owned by Barnes Rogers, decedent, Clarence Rogers, Janie Rogers Allen, Elizabeth Rogers Sledge, and the C.M.A. Rogers estate. The 1,056 acres owned by Barnes Rogers, et al., were owned by Barnes Rogers, decedent, and Clarence Rogers.

Sumter County, Alabama, is located in western Alabama along the Mississippi/Alabama line. It is bordered on the north by Pickens County, Alabama. In turn, Pickens County is bordered on the north by Fayette County, Alabama.

In analyzing the comparability of the seven leased tracts and the Five estate tracts, Dr. Haney first excluded the Hurst tract in Fayette County, Alabama, because of the distance from the Five estate tracts. Next, Dr. Haney excluded the Irwin tract of land in Pickens County because of differences in slope and soil mix. Both respondent and petitioner agree with Dr. Haney's exclusion of the Hurst tract and the Irwin tract. The remaining five tracts of timberland (five leased tracts) are subject to long-term timber leases for the growing and harvesting of timber.

The five estate tracts are comparable to the five leased tracts in the following general respects. See appendixes 1-5.

First, the soil in the three-county black belt soil area of Alabama along the Mississippi border where the five estate tracts and the five leased tracts are located is a transition mix between sandy clay and post oak black belt soil. Second, none of the timber on the five estate tracts depletes the soil significantly or in a different manner from the timber on the five leased tracts. Third, the conservation techniques employed are similar. The conservation techniques are generally the same on all managed timberland. Leased property is clear cut and replanted instead of select cut which is true in almost every lease comparison. Fourth, all of the properties are subject to periodic flooding. Fifth, all of the land is relatively flat. Sixth, all of the properties have a hardwood/pine mix. Seventh, each of the properties is unified as a separate property but is segmented by logging roads that allow movement. Eighth, only two of the properties have any improvements, the Lanford A and the Woodward tracts. Those improvements are valued at approximately $2,707 and $5,610,[2] respectively, according to the Butler & Gardiner appraisal.[3] An adjustment can be made for those

---

[2]The insignificance of these improvements is demonstrated by the fact that the $5,610 represents the aggregate value of five separate structures.

[3]Butler & Gardiner, Inc. (Butler & Gardiner), along with Caldwell Realty prepared appraisals of the farmland and timberland for the Estate of Carolyn Rogers. Butler & Gardiner prepared both an original and a supplemental report. The parties
(continued...)

comparatively small improvements.[4]  Ninth, all of the properties
in these three counties have access to secondary roads and
similar access to markets.

Several of the tracts of the leased timberland also had
small camp houses on them like those on the Lanford A and the
Woodward tracts.  For example, a summer camp house was located on
the Allen timberland (the Barnes Rogers, et al. March Lease) when
that lease was executed.  The presence of a camp house made no
difference in the rental rate and, according to the lessee, no
adjustment was made to the rents because of this cabin, which is
similar to the camp houses on the Lanford A and the Woodward
tracts.

Dr. Haney concluded that a comparison of the five estate
tracts to all five leased tracts would be the most reliable.  He
noted that the timber on one of the five estate tracts was
virtually identical to the timber on one of the five leased
tracts.  Second, he noted that the timber quality and capability

---

[3](...continued)
agree that these reports are accepted as if the author had
testified to their contents.

Butler & Gardiner provides forest management services and
appraisals.  Both Gary Butler and John Caldwell are Certified
General Real Estate Appraisers.

[4]Dr. Haney separated the improvements on the Lanford A and
Woodward tracts from the valuation of the land and concluded they
should be added to whatever value might be determined under the
rent capitalization approach.

of the five leased tracts were somewhat superior to the timber quality on the five estate tracts. Because of this difference, he concluded that a downward adjustment of no more than 10 percent was warranted.

Except for the timber volumes, timber quality, and timber quantity on these lands, respondent does not question that the lands included in the leases for the five leased tracts are physically comparable to the timberlands elected for special use valuation by petitioner. The foregoing includes timberland only and specifically does not include standing timber and pastureland.

Respondent has submitted an original and two rebuttal reports from his expert, Richard Maloy. The parties agree that these reports are accepted as if the author had testified to their contents. Maloy & Co., Inc., provides real estate appraisals. Richard Maloy graduated from the University of Alabama with a B.S. in marketing in 1973 and obtained his J.D. from the Birmingham School of Law in 1979. He is a Licensed Real Estate Broker and a State Certified General Real Estate Appraiser in the State of Alabama.

Mr. Maloy contends that "Comparable leases must have been negotiated under recent (5-year period of analysis) dates to ensure comparability of economic conditions." Mr. Maloy further states the following: "Lease comparability under section

2032A(e)(7) would require recent leases, foreseeable within the 5-year average. This is relatively easy in row crop valuation, but generally eliminates the use of this section in timber land valuation."

Timber leases are made between the land owner as lessor and a lessee who desires timber or timber products. The lessees are typically timber companies or paper companies that use wood products in their basic business. Among other rights, timber leases give the lessee the right to enter the property and harvest timber for a specific period of time. Because of the long growth cycle of timber, timber leases are generally long-term leases. Leases of 30 to 60 years are not uncommon. A typical 60-year timber lease would generally allow the lessee to grow and cut the timber two to three times during the term of the lease.

The typical timber lease in effect in western Alabama between 1987 and 1991 was entered into in the 1950's, 1960's, and early 1970's and was a long-term timber lease. In the typical situation, the lessor sold the existing timber by separate transaction to a buyer (generally, the buyer was the same as the lessee but was not required to be the same) and then rented the land by timber lease. Rent paid by the lessee was calculated on a dollar per acre per year basis. Some of the timber leases had rent escalation clauses which increased the rent per acre per

year in relation to some external standard, such as the Wholesale Price Index (now called the Producer Price Index). The leases submitted by petitioner are representative of such typical lease transactions.

The record contains a letter from Gulf States Paper Corp. (Gulf States), which identifies timberland rental rates for the years 1988 through 1992 on several long-term timber leases Gulf States initiated during the late 1960's. These rates range from $9.31 per acre per year to $10.83 per acre per year for properties located in Sumter County, Alabama, ranging from 420 acres to 2,526 acres.

The record contains a letter from James M. Vardaman & Co., Inc. (Vardaman), forest management specialists for timberland owners, stating that it did not have any knowledge of timber companies providing long-term leases between the years 1987 through 1991 in Sumter County, Alabama. The letter further states that the long-term leasing programs that Vardaman is familiar with originated before 1987. The record also contains a letter from Richard G. Cross of Pruitt, Pruitt & Watkins, Attorneys at Law, indicating that Mr. Cross had reviewed the indexes of the Probate Office of Sumter County for long-term timber leases from 1987 to 1991, but none were noted. His search included Gulf States, International Paper, McMillian, and Hammermill. In addition, Mr. Cross checked with two other

individuals who worked in the Probate Office, and they were unaware of such leases during this period.

On the date of execution of the leases for the five leased tracts, the standing timber had been sold by the lessors. The leases did not give any right to the lessee to cut any timber standing on the leased property on the date of execution of the lease. The leases did give the lessee the right to cut timber grown on the leased property during the term of the lease.

The March 1968 lease for the Barnes Rogers, et al. tract contained the following provision:

<u>USE OF THE PREMISES</u>

2. During the term of this Lease, Gulf States shall have all rights to grow, cut and to remove timber from the Premises (in addition to the timber separately conveyed by a timber purchase agreement between the parties hereto as of this date), and shall have the full and complete possession, use, control and enjoyment of the premises, and all possessory rights with respect thereto, including agricultural rights, excepting only those rights hereinafter specifically reserved to LESSORS.

Without limiting the generality of the foregoing, Gulf States shall have the right to protect, cultivate, spray, thin deaden and otherwise manage all timber and timber products on the Premises, and to cut, harvest, mill and process all timber and timber products (including saw timber, pulpwood, fuel wood, stumps, tops, turpentine and naval stores), which are now growing or shall come into existence during the term of this Lease (in addition to the timber separately conveyed by a timber purchase agreement between the parties hereto as of this date), or to contract with others for such acts to be done, and to use, sell or otherwise dispose of such timber and timber products for its benefit in such manner as it may elect.

Each of the leases for the five leased tracts contains a similar provision regarding use of the premises.

The March 1968 lease for the Barnes Rogers, et al. tract contained the following rent escalation clause in its "Rent" provision:

> Gulf States will pay to LESSORS an annual rental beginning at the rate of $3.00 per acre; provided, however, that during the term of the lease and any renewal thereof, that the annual rental per acre shall be increased or decreased by the same percentage as the annual average of the Wholesale Price Index for All Commodities, published by the United States Department of Labor, Bureau of Labor Statistics, shall increase or decrease over or under the average for the calendar year 1966, but the rental rate shall not be adjusted more than once annually and only for increments of increase or decrease of 5% or more of the 1966 average with respect to the first adjustment or from the average which made necessary the previous increase or decrease of rental rate with respect to any subsequent adjustment.

Each of the leases for the five leased tracts contains a similar rent escalation clause in its Rent provision.

With respect to the five leased tracts that petitioner asserted were comparable to decedent's lands which are specially valued, the annual gross rentals for the 5 calendar years preceding decedent's death are as follows:

|  | 1987 | 1988 | 1989 | 1990 | 1991 |
|---|---|---|---|---|---|
| Barnes Rogers et al. March Lease 1665.28 acres | $15,503.76 | $15,503.76 | $15,503.76 | $15,503.76 | $16,386.35 |
| Barnes Rogers, et al. Timberland - April Lease 860.8 acres | 8,014.05 | 8,014.05 | 8,014.05 | 8,014.05 | 8,470.27 |

| | | | | | |
|---|---|---|---|---|---|
| Richardson Timberland<br>Sept. Lease<br>261 acres | 2,505.60 | 2,505.60 | 2,505.60 | 2,505.60 | 2,648.36 |
| Clarence L. Rogers<br>Timberland - Sept. Lease<br>489 acres | 4,630.83 | 4,630.83 | 4,630.83 | 4,630.83 | 4,890.00 |
| Clarence Rogers<br>Timberland - Sept. Lease<br>420 acres | 4,305.00 | 4,305.00 | 4,305.00 | 4,305.00 | 4,548.60 |

The average annual gross cash rental from the five leased tracts for the 5 years preceding decedent's death was $9.6964 per acre.

With respect to the five leased tracts that petitioner asserted were comparable to decedent's lands which are specially valued, the State and local real estate taxes paid for the 5 calendar years preceding decedent's death are as follows:

| | 1987 | 1988 | 1989 | 1990 | 1991 |
|---|---|---|---|---|---|
| Allen Timberland<br>March Lease<br>1665.28 acres | $1,552.04 | $1,552.04 | $2,284.76 | $2,284.76 | $2,181.76 |
| Clarence L. Rogers<br>Timberland<br>April Lease<br>860.8 acres | 802.27 | 802.27 | 1,181.02 | 1,181.02 | 1,181.02 |
| Richardson Timberland<br>Sept. Lease<br>261 acres | 264.58 | 264.65 | 264.65 | 264.68 | 265.34 |
| Clarence L. Rogers<br>Timberland<br>Sept. Lease<br>489 acres | 455.75 | 455.75 | 670.91 | 670.91 | 670.91 |
| Barnes Rogers<br>Timberland<br>Sept. Lease<br>420 acres | 391.44 | 391.44 | 576.24 | 576.24 | 576.24 |

The average annual State and local real estate taxes paid on the five leased tracts for the 5 years preceding decedent's death were $1.1592 per acre.

The average annual effective interest rate for all new Federal Land Bank loans for the 5 years preceding decedent's death was 10.21 percent.

### Discussion

I.  Overview of Section 2032A--Special Use Valuation

Generally, a decedent's gross estate includes the fair market value of the decedent's interest in all property in which the decedent owned an interest at the time of death.  See secs. 2031, 2033; sec. 20.2031-1(b), Estate Tax Regs.  However, in the case of certain real property used by the decedent or a member of the decedent's family for farming or in a closely held business, section 2032A allows the decedent's personal representative to elect to value the real property on the basis of its value as a farm or in a closely held business, rather than the fair market value of the property determined on the basis of its "highest and best use".  Sec. 20.2032A-3(a), Estate Tax Regs.; see sec. 2032A(a)(1), (e)(7) and (8); see also Stovall v. Commissioner, 101 T.C. 140, 146 (1993); Estate of Thompson v. Commissioner, T.C. Memo. 1998-325.

Section 2032A was added to the Code by the Tax Reform Act of 1976, Pub. L. 94-455, sec. 2003, 90 Stat. 1520, 1856.  The

purpose of the special use valuation provision is to reduce the estate tax burden, thereby alleviating liquidity problems faced by the surviving family of a person who died owning real property used as a farm or in a closely held business.  See H. Rept. 94-1380, at 21-22 (1976), 1976-3 C.B. (Vol. 3) 735, 755-756; see also S. Rept. 94-938 (Part 2), at 15 (1976), 1976-3 C.B. (Vol.3) 643, 657.  Congress sought to allow the family to continue operating the farm or other business, rather than force the sale of the land to pay estate taxes.  See Estate of Mapes v. Commissioner, 99 T.C. 511, 516-517 (1992); Estate of Thompson v. Commissioner, T.C. Memo. 1998-325.; H. Rept. 94-1380, supra at 21-22, 1976-3 C.B. (Vol. 3) at 755-756; S. Rept. 94-938 (Part 2), supra at 15, 1976-3 C.B. (Vol. 3) at 657.

Additionally, the benefit afforded by section 2032A is not open ended; the maximum aggregate reduction in value allowable by the statute for qualified real property with respect to any decedent is $750,000.  See sec. 2032A(a)(2).

Farms may be specially valued under section 2032A by using one of two methods, the formula method under section 2032A(e)(7) or the five-factor method under section 2032A(e)(8).

A.    Section 2032A(e)(7)[5]--The Formula Method

---

[5]    SEC. 2032A(e).  Definitions; Special Rules.--For purposes of this section--

          *    *    *    *    *    *    *

(7) Method of valuing farms.--

     (A) In general.--Except as provided in subparagraph (B), the value of a farm for farming purposes shall be determined by dividing--

          (i) the excess of the average annual gross cash rental for comparable land used for farming purposes and located in the locality of such farm over the average annual State and local real estate taxes for such comparable land, by

          (ii) the average annual effective interest rate for all new Federal Land Bank loans.

For purposes of the preceding sentence, each average annual computation shall be made on the basis of the 5 most recent calendar years ending before the date of the decedent's death.

     (B) Value based on net share rental in certain cases.--

          (i) In general.--If there is no comparable land from which the average annual gross cash rental may be determined but there is comparable land from which the average net share rental may be determined, subparagraph (A)(i) shall be applied by substituting "average annual net share rental" for "average annual gross cash rental".

          (ii) Net share rental.--For purposes of this paragraph, the term "net share rental" means the excess of--

               (I) the value of the produce received by the lessor of the land on which such produce is grown, over

(continued...)

The first of these methods is the formula method under section 2032A(e)(7).  This method is based upon the capitalization of rents of comparable properties.  The method is based on a strict formula (objective factors), and the formula is set forth in the statute and the regulations.

Under the formula method, the special use value is determined by reference to the cash rents of comparable properties.  The special use value of the property is determined mathematically by taking the excess of:

(1)  The average annual gross cash rental for comparable land used for farming purposes and located in the locality of such farm, over

(2)  the average annual State and local real estate taxes for such comparable property.

---

[5](...continued)

> > (II) the cash operating expenses of growing such produce which, under the lease, are paid by the lessor.

> (C) Exception.--The formula provided by subparagraph (A) shall not be used--

> > (i) where it is established that there is no comparable land from which the average annual gross cash rental may be determined and that there is no comparable land from which the average net share rental may be determined, or

> > (ii) where the executor elects to have the value of the farm for farming purposes determined under paragraph (8).

This average rent amount is then divided by a capitalization factor based on the average annual effective interest rate for all new Federal Land Bank loans.  The average annual computation is performed on the basis of the 5 most recent calendar years ending before the date of the decedent's death.  See sec. 2032A(e)(7)(A); sec. 20.2032A-4(a), Estate Tax Regs.

The annual gross cash rental is the amount of cash rental of actual tracts of comparable farmland in the same locality, not reduced by any expenses or liabilities associated with the farm. See sec. 20.2032A-4(b)(1), Estate Tax Regs.  The executor is required to identify actual comparable property and the cash rentals from the comparable property for all of a decedent's property that is specially valued.  See Estate of Strickland v. Commissioner, 92 T.C. 16, 24 (1989).  The regulations require that the executor be able to substantiate the valuation with supporting documentation, including identification of comparable property and cash rentals from that property.  See sec. 20.2032A-4(b)(2)(i), Estate Tax Regs.

Section 2032A(e)(7) provides that the value of a farm for farming purposes shall be determined by the formula method of valuation unless:  (1) It is established that there is no comparable land from which the average annual gross cash rental or average net share rental can be determined; or (2) the executor elects to have the value of the farm determined under

the five factor method of section 2032A(e)(8).  See sec.

2032A(e)(7)(C).

B. Section 2032A(e)(8)[6]--The Five Factor Method

The second valuation method is set forth under section

2032A(e)(8).  This method is based upon the application of five

---

[6]    SEC. 2032A(e).  Definitions; Special Rules.-For purposes of this section–

        *    *    *    *    *    *    *

        (8)  Method of valuing closely held business interests, etc.--In any case to which paragraph (7)(A) does not apply, the following factors shall apply in determining the value of any qualified real property:

        (A) The capitalization of income which the property can be expected to yield for farming or closely held business purposes over a reasonable period of time under prudent management using traditional cropping patterns for the area, taking into account soil capacity, terrain configuration, and similar factors,

        (B) The capitalization of the fair rental value of the land for farmland or closely held business purposes,

        (C) Assessed land values in a State which provides a differential or use value assessment law for farmland or closely held business,

        (D) Comparable sales of other farm or closely held business land in the same geographical area far enough removed from a metropolitan or resort area so that nonagricultural use is not a significant factor in the sales price, and

        (E) Any other factor which fairly values the farm or closely held business value of the property.

valuation factors. The five factors set forth in section 2032A(e)(8) are: (1) The capitalization of income which the property can be expected to yield for farming purposes; (2) the capitalization of the fair rental value of the land for farmland; (3) the assessed land value for ad valorem real estate tax purposes; (4) the sale price of comparable parcels of farmland in the geographic area; and (5) any other factor which fairly values the farmland.

Valuation under the five factor method of section 2032A(e)(8) is required under certain circumstances. If rents for comparable property are not available, then petitioner must use section 2032A(e)(8) to value the property. See sec. 20.2032A-4(a), Estate Tax Regs.

## II. Comparable Land

Petitioner asserts that the five estate tracts and the five leased tracts are "comparable land". Respondent contends that the five estate tracts and the five leased tracts are physically comparable as to land only and that the five estate tracts and the five leased tracts are not comparable in any manner in regard to timber volumes, timber quality, and timber quantity, and to rental values.

In order to use section 2032A(e)(7), the estate must identify "comparable land". The Oxford English Dictionary (1993), the Merriam-Webster's Collegiate Dictionary (10th ed.

1998), and the American Heritage College Dictionary (3d ed. 1993) define the word "comparable" as "able to be compared (with); worthy of comparison; fit to be compared (to)," "capable of or suitable for comparison," or "admitting of comparison with another or others."

Section 20.2032A-4(d), Estate Tax Regs., defining "comparable real property," states that "Comparable real property must be situated in the same locality as the specially valued property." In the case before us, location was the first consideration in determining the five leased tracts, as Dr. Haney excluded one of the two other potential comparables based on slightly greater distance. The five estate tracts and the five leased tracts are all located in the black belt soil area of western Alabama along the Mississippi border. Indeed, four out of the five leased tracts are located in the same county as all five estate tracts, and the fifth comparable is in the adjacent Pickens County on the north.

Section 20.2032A-4(d), Estate Tax Regs., sets forth the following factors as among those to be considered in determining comparability:

> (1) Similarity of soil as determined by any objective means, including an official soil survey reflected in a soil productivity index;

> (2) Whether the crops grown are such as would deplete the soil in a similar manner;

(3)  The types of soil conservation techniques that have been practiced on the two properties;

(4)  Whether the two properties are subject to flooding;

(5)  The slope of the land;

(6)  In the case of livestock operations, the carrying capacity of the land;

(7)  Where the land is timbered, whether the timber is comparable to that on the subject property;

(8)  Whether the property as a whole is unified or whether it is segmented, and where segmented, the availability of the means necessary for movement among the different segments;

(9)  The number, types, and conditions of all buildings and other fixed improvements located on the properties and their location as it affects efficient management and use of property and value per se; and

(10)  Availability of, and type of, transportation facilities in terms of costs and of proximity of the properties to local markets.

Furthermore, the determination of properties which are comparable is a factual one and must be based on numerous factors, no one of which is determinative.  See id.

The five estate tracts and the five leased tracts share all nine features applicable to timberland.  See appendixes 1-5. First, the soil in the three-county black belt soil area of Alabama along the Mississippi border where all five estate tracts and the five leased tracts are located is a transition mix between sandy clay and post oak black belt soil.  Second, none of the timber on the five estate tracts depletes the soil

significantly or in a different manner from the timber on the five leased tracts. Third, the conservation techniques employed are similar. The conservation techniques are generally the same on all managed timberland. Leased property is clear cut and replanted instead of select cut which is true in almost every lease comparison. Fourth, all of the properties are subject to periodic flooding. Fifth, all of the land is relatively flat. Sixth, all of the properties have a hardwood/pine mix. Seventh, each of the properties is unified as a separate property but is segmented by logging roads that allow movement. Eighth, only two of the properties have any improvements, the Lanford A and the Woodward tracts. Those improvements are valued at approximately $2,707 and $5,610, respectively, according to the Butler & Gardiner appraisal. Ninth, all of the properties in these three counties have access to secondary roads and similar access to markets.

As a general principle in valuing timberlands or any other type of real estate, no two properties are identical. Properties can be compared, however, when they have enough characteristics in common. Such properties may be similar but not identical as to those characteristics, and only rarely will any two properties be similar as to all factors. Special use valuation under the rent capitalization method necessarily requires comparison of unleased property with leased property. The reason is that

property leased for a cash rental generally does not qualify for special use valuation, and this method requires a determination of the average rent on similar property that is leased.

Some differences invariably exist between any two timber properties, and Dr. Haney addressed such modest differences in his reports.  First, he noted that the timber on one of the five estate tracts was virtually identical to the timber on one of the five leased tracts.  He concluded, however, that a comparison to all five leased tracts would be more reliable.  Second, he noted that the timber quality and capability of the five leased tracts were somewhat superior to the timber quality on the five estate tracts.  On the basis of this difference, he concluded that a downward adjustment of no more than 10 percent was warranted.

Such an adjustment is inappropriate as it does not comply with Congress' purpose in providing a simple, objective "Method of valuing farms" in section 2032A(e)(7), which is embodied in section 20.2032A-4(b)(2)(iii), Estate Tax Regs., and which prohibits the use of appraisals because they are not true measures of the actual cash rental value of comparable property in the same locality as the specially valued property.

Here, the five estate tracts and the five leased tracts are tracts of land of the same general size in the same locale, used for the same agricultural purpose, with the same soil and same slope.  On the basis of normal timberland valuation principles

and the factors noted above, the five leased tracts (four of which are located in Sumter County, Alabama) are highly comparable to each of the five estate tracts--all of which are located in Sumter County.  Thus, we find and determine that the five estate tracts and the five leased tracts are highly comparable.

In Estate of Thompson v. Commissioner, T.C. Memo. 1998-325, we concluded that the taxpayer had failed to identify comparable real properties and cash rentals within the meaning of section 2032A(e)(7), where the expert's adjusted net lease income per acre figures were more akin to an appraisal, which is expressly prohibited by section 20.2032A-4(b)(2)(iii), Estate Tax Regs., rather than an accurate calculation of actual cash rents.

In Estate of Thompson we concluded that the expert's report was completely unreliable as to whether any of eight  properties were indeed comparable to the subject property for the following reasons.  First, the alleged comparable properties ranged in size from 44 acres to 34,365 acres, compared to the subject property of 2,929 acres.  In addition, the expert made no adjustments due to differences in location, land quality, or timber type/maturity.  Moreover, no description of the properties was contained in the expert's report.

In decedent's estate here, five out of seven tracts share nine out of the nine applicable features set forth in section

20.2032-4(d), Estate Tax Regs.  For decedent's estate, the range in size of comparables is much tighter:  comparables of 261 to 1,665.28 acres (for subject properties ranging from 65-1670 acres).  Furthermore, Dr. Haney excluded potential comparables because of differences in location, land quality, and timber type/maturity.  Dr. Haney excluded the potential comparable in Fayette County because of location; he excluded a Pickens County tract with somewhat different slope and soil.  Further, Dr. Haney proposed a 10-percent reduction to four of the subject properties, because of the superior quality of timber on the five leased tracts.  As noted previously, however, such a reduction is inappropriate as appraisals are not true measures of the actual cash rental value of comparable property.  Moreover, petitioner provided detailed descriptions of the subject properties and the leased properties in the original estate tax return; more detailed descriptions of the leased properties are provided in the leases and Dr. Haney's reports.

The eight leases in Estate of Thompson were entered into over a 27-year period, some with no rent escalation clause.  For those leases with no rent escalation clause, the expert claimed to have applied the "Producer Price Index" (PPI) in an effort to calculate the market rental value of those properties for the 5-year period preceding decedent's death.  Petitioner requested that we take judicial notice of Report 807, Escalation and

Producer Price Indexes: A Guide for Contracting Parties issued

by the U.S. Department of Labor, Bureau of Labor Statistics in

September 1991 for the purpose of establishing that the PPI can

be applied to contract rents to calculate accurately fair market

rents for future years in the absence of escalation clauses, as

the expert claimed to have done. We determined in Estate of

Thompson that:

> Report 807 does not support the proposition that market
> rents for the relevant period can be accurately calculated
> from contract rents entered into several decades beforehand
> via the application of the PPI for purposes of section
> 2032A(e)(7)(A) for those leases which do not themselves
> contain rent escalation clauses. Rather, Report 807
> provides guidance to contracting parties with respect to the
> use of price adjustment clauses at the time the contract is
> entered into. * * *

In Estate of Thompson the average gross cash rental for the

5 years preceding the decedent's death was determined by the

expert on the basis of his "personal knowledge * * * what I

thought would be the indicated market rent for what I knew about

the whole business, and that's it." Furthermore, the expert

testified that he validated his estimate of the cash rental rate

for the timberland by reference to the prevailing rate for

cropland during the relevant period, of which there was no

evidence.

In decedent's estate here, the special use valuation of the

five estate tracts is based exclusively on actual cash rents from

the five leased tracts for the 5 years preceding decedent's

death.  All five leases for the five leased tracts contain rent escalation clauses; as escalated, the leases constituted the prevailing rents during the statutory period on that type of land.  Both the actual rents and State and local property taxes were explained and are fully substantiated with original source data.  There is no adjustment to rents because petitioner used only actual current rents during the statutory period.

Respondent also asserts that the five estate tracts and the five leased tracts are not comparable in any manner in regard to the rental values.  Respondent contends that the regulations require that "generally accepted real property valuation rules" be applied to determine comparability of the property.  Sec. 20.2032A-4(d), Estate Tax Regs.  Respondent asserts that the maximum period allowed under real estate valuation rules is 5 years prior to the valuation date.  On brief, respondent states this argument as follows:

> Leases that establish the applicable rents are leases that would have been negotiated and entered into during the five-year period.  Leases that were negotiated more than five years prior to the date of death do not accurately reflect the economic conditions at the date of death and the current rental values of comparable lands.

Comparability must be based on numerous factors, no one of which is determinative.  See sec. 20.2032A-4(d), Estate Tax Regs.  All factors generally considered in real estate valuation are to be considered in determining comparability under section 2032A.

See id.  However, respondent seeks to exclude the comparable land on the basis of one factor and one factor only (the age of the leases--which is not even one of the factors enumerated in the regulations).

Neither the statute nor the regulations support respondent's position in that respect.  In this case, the parties stipulated that the typical timber lease in effect in western Alabama between 1987 and 1991 was entered into in the 1950's, 1960's, and early 1970's and was a long-term timber lease.  Respondent's argument would exclude every lease executed before August 19, 1987, which would effectively operate to prevent estates in Alabama from using section 2032A(e)(7) to value timberland since the typical timber lease in effect in western Alabama between 1987 and 1991 was entered into in the 1950's, 1960's, and early 1970's.

Respondent has submitted an original and two rebuttal reports from his expert, Richard Maloy.  Mr. Maloy contends that, "Comparable leases must have been negotiated under recent (5-year period of analysis) dates to ensure comparability of economic conditions."  Mr. Maloy is simply parroting respondent's primary legal argument that would inject an arbitrary requirement for application of section 2032A(e)(7)--that is, as a matter of law no lease can be considered unless it was executed within 5 years of the date of death.  We have stated before, in Alumax v.

<u>Commissioner</u>, 109 T.C. 133, 171 (1997): "We shall disregard any opinion of an expert that constitutes nothing more than that expert's legal opinion or conclusion about a particular matter."

Mr. Maloy further states the following: "Lease comparability under section 2032A(e)(7) would require recent leases, foreseeable within the 5-year average. This is relatively easy in row crop valuation, but generally eliminates the use of this section in timber land valuation."

Two consecutive paragraphs establish that the protection afforded farms by section 2032A was intended to apply to timberland. Section 2032A(e)(7) sets forth the "Method of valuing farms." Section 2032A(e)(4) and (5) leaves no doubt that timber operations are included under section 2032A(e)(7) and (8). Furthermore, factor (7) under section 20.2032A-4(d), Estate Tax Regs., obviously contemplates that rented timberland may be comparable property.

As stipulated, the leases represented the typical timber leases in effect in western Alabama during the 5-year statutory period. Moreover, the inflation-adjusted rents paid under these leases constituted the prevailing rents in effect during the statutory period. All of the leases on the five leased tracts have escalation clauses. Moreover, in contrast to the fatal "judgment call" as to the annual rents in <u>Estate of Thompson v.</u>

- 36 -

*Commissioner*, T.C. Memo. 1998-325, the parties have stipulated the precise, actual annual gross rents for the statutory period.

Consequently, with their escalation clauses, the stipulated rents constitute the prevailing rents actually paid on comparable land in western Alabama under the typical/standard lease in effect during the statutory period. Once the unleased and the leased land are determined to be comparable (as we have found), section 2032A(e)(7) permits petitioner to use for valuation purposes the average annual gross cash rents for the 5 calendar years preceding decedent's death.

III. Standing Timber

Petitioner asserts that the rent capitalization method of valuing farms incorporates the timber on the five estate tracts because (i) the right to cut timber is embedded in the standard timber leases from which that value is drawn, and (ii) the estate made a proper "qualified woodland" election pursuant to section 2032A(e)(13). Respondent contends that the rent capitalization value includes only the value of the bare land and does not include the timber growing on decedent's lands.

Congress adopted section 2032A(e)(13) as part of the Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 421(h), 95 Stat. 172, 311-312, which provides:

(13) Special rules for woodlands.--

(A)  In general.--In the case of any qualified woodland with respect to which the executor elects to have this subparagraph apply, trees growing on such woodland shall not be treated as a crop.

(B)  Qualified woodland.--The term "qualified woodland" means any real property which--

(i) is used in timber operations, and

(ii) is an identifiable area of land such as an acre or other area for which records are normally maintained in conducting timber operations.

(C)  Timber operations.--The term "timber operations" means--

(i) the planting, cultivating, caring for, or cutting of trees, or

(ii) the preparation (other than milling) of trees for market.

(D)  Election.--An election under subparagraph (A) shall be made on the return of the tax imposed by section 2001.  Such election shall be made in such manner as the Secretary shall by regulations prescribe.  Such an election, once made, shall be irrevocable.

The report of the Senate Finance Committee accompanying the 1981 enactment of section 2032A(e)(13) specifically states that an election under section 2032A(e)(13) results in the standing timber's being thereafter specially valued as "part of the qualified real property on which the timber is located, rather than valuing it as other growing crops."  S. Rept. 97-144, at 135 (1981), 1981-2 C.B. 412, 465.  The Senate Finance Committee report explains how this provision interacts with the rent capitalization method:

Special Rule for Standing Timber.--The bill provides that the executor can elect to treat standing timber as an interest in real property and specially value the timber as part of the qualified real property on which the timber is located, rather than valuing it as other growing crops. Standing timber is to be specially valued by reference to similar timber located on comparable land where both the land and timber are rented for timber growing purposes under a cash or share rental lease. If no comparable timber and land are so rented in the locality of the decedent's property, the timber and land are to be specially valued using the multiple factor method. [Id. at 135-136, 1981-2 C.B. at 465; fn. refs. omitted.]

In sum, the timber is already included in the section 2032A(e)(7) rent capitalization value drawn from timber leases that include the right to cut timber.

The Senate Finance Committee report recognizes that, in the absence of timber leases, the section 2032A(e)(8) multiple factor method would apply. Congress adopted the statutory timber election with the intent that it would apply to the standard timber lease "on comparable land where both the land and timber are rented for timber growing purposes under a cash or share rental lease." That result is further confirmed by the distinction drawn by the Senate Finance Committee report that "Leases for purposes other than for growing timber to which the comparable land is subject are to be ignored in determining the value of qualified timber property in its current use." Id. at 135 n.10, 1981-2 C.B. at 465 n.10. The purpose of a timber lease is to capture the value of the timber. As demonstrated by the lease language, the 1987-91 rent from which the rent

capitalization value is derived constituted the consideration for the right to grow and cut timber. The rent capitalization value captures the value of that timber just as Congress contemplated in the section 2032A(e)(13) qualified woodland election.

The standard timber leases on the five leased tracts include the "timber * * * rented for timber growing purposes", as demonstrated by the following two stipulated facts. First, the rent paid under the leases applicable to the five leased tracts includes the consideration paid for the right to grow and cut the timber grown on the leased property during the term of the lease. Second, the estate timely elected and qualified for a "qualified woodland" election on section 2032A property that the estate seeks to value by reference to these timber leases. The value of the timberland is, therefore, included in the rent capitalization value of those tracts.

Respondent also contends that the "segmenting" language of section 20.2032A-4(d), Estate Tax Regs., requires that the timber be separately valued. Respondent cites section 20.2032A-4(d), Estate Tax Regs., which provides:

> It will, therefore, frequently be necessary to value farm property in segments where there are different uses or land characteristics included in the specially valued farm. * * * In cases involving multiple areas or land characteristics, actual comparable property for each segment must be used, and the rentals and taxes from all such properties combined (using generally accepted real property valuation rules) for use in the valuation formula given in this section.

Respondent asserts that because of the different land uses and characteristics of decedent's lands, section 20.2032A-4(d), Estate Tax Regs., requires that the timberland, standing timber, and pastureland all be separately valued. Respondent further asserts that because the leases of "comparable land" that petitioner presented and relies upon are leases of only bare timberland which do not include the rental value of land containing standing timber or pasture, the leases are totally irrelevant to the valuation of standing timber or pastureland under section 2032A(e)(7).

In adopting and explaining the "qualified woodland" election in section 2032A(e)(13), Congress explicitly provided that the value of the timber would not be "segmented" and separately valued as a crop: Congress explained that the timber would be included in the rent capitalization value of the land where the underlying lease incorporated the right to grow and cut timber.

In short, the estate's timber is already incorporated into the rent capitalization value because the base rent already includes the right to cut the timber. Notably, the parties have stipulated that the standard timber leases covering the five leased tracts are precisely the type contemplated by the "qualified woodland" election. Each of them is a lease that covers the harvesting of timber grown during the term of the lease. We reject respondent's argument that the conspicuously

labeled "qualified woodland" election does not apply to timber valued by reference to the standard woodlands lease. We conclude that the rent on the comparable land incorporates the value of the timber standing in 1992 because it pays for the right to harvest all timber grown during the term of the lease. Consequently, we hold that petitioner can value the timberland and standing timber under the provisions of section 2032A(e)(7).

IV. Pastureland

Petitioner asserts that the formula method under section 2032A(e)(7) should also be applied to the portion of the estate's timberland which was in cleared pasture and suitable for a new stand of timber. Respondent contends that the pastureland must be valued using the five factor method of section 2032A(e)(8).

The parties stipulated that the Woodward parcel, which was in pasture (and therefore suitable for a new stand of timber), constitutes "qualified woodland". Consequently, we find that petitioner has provided comparable real property from which to value the Woodward tract, which was in pasture.

The following three parcels of pastureland did not constitute "qualified woodland":

| Tract | Valuation Elected |
|-------|-------------------|
| Lanford A | 150 acres - pasture |
| Lanford B | 125 acres - pasture |
| Patterson | 65 acres - pasture |

Petitioner has failed to provide sufficient information from which to make a valuation of pastureland that does not constitute "qualified woodland" under the formula method. Section 20.2032A-4(a) and (b)(2), Estate Tax Regs., requires that, if the estate desires valuation under section 2032A(e)(7), the executor must provide to the Internal Revenue Service leases of actual comparable property and the cash rental from the property. Although the record does contain a copy of a lease on clear land in Sumter County, petitioner has not satisfied us that this is comparable pastureland. Consequently, petitioner failed to satisfy the requirement to provide comparable leases and establish rental values of comparable pasturelands in order to specially value decedent's pastureland under section 2032A(e)(7). Consequently, there is no justification or basis for a section 2032A(e)(7) valuation of the pastureland located on the Lanford A, Lanford B, and Patterson tracts.

Since the Woodward parcel of pastureland constitutes "qualified woodland", we hold that it may also be valued under the provisions of section 2032A(e)(7). Furthermore, we hold that the three parcels of pastureland that did not constitute "qualified woodland", located on the Lanford A, Lanford B, and Patterson tracts, must be valued under the provisions of section 2032A(e)(8).

V.  Conclusion

We find and conclude that the leases provided by petitioner are leases of comparable land for the 5 most recent calendar years ending before the date of decedent's death.  Consequently, we hold that petitioner can value the timberland and standing timber under the provisions of section 2032A(e)(7).  Since the Woodward parcel of pastureland constitutes "qualified woodland", we hold that it may also be valued under the provisions of section 2032A(e)(7).

As a result, the rent capitalization value is the excess of (i) the average annual gross cash rents from the comparable five leased tracts for the prior 5 years ($9.6964) over (ii) the average annual State and local real estate taxes for the same period ($1.1592), divided by (iii) the average annual interest rate on Federal Land Bank loans for the same period (10.21 percent).  The result is a per-acre rent capitalization value of $83.6161.

Furthermore, the improvements located on the Lanford A and Woodward tracts are valued at approximately $2,707 and $5,610, respectively, according to the Butler & Gardiner appraisal.  We hold that these amounts should be added to the value of the land.

In addition, we find and conclude that petitioner failed to satisfy the requirement to provide comparable leases and establish rental values of comparable pasturelands in order to

specially value decedent's pastureland that did not constitute "qualified woodland" under the provisions of section 2032A(e)(7). As a result, we hold that the three parcels of pastureland that did not constitute "qualified woodland", located on the Lanford A, Lanford B, and Patterson tracts, must be valued under the provisions of section 2032A(e)(8).  Consequently, the value of the pastureland for purposes of section 2032A(e)(8) is $350 per acre (less a 15-percent discount for pastureland in the Lanford A and Lanford B tracts).

We have considered all other arguments advanced by the parties, and to the extent they are not addressed herein, we find them to be neither relevant nor persuasive.

To reflect the foregoing,

Decision will be entered

under Rule 155.

Appendix 1

SUBJECT PROPERTY #1- "EGYPT TRACT"

| FACTORS: | Similarity of Soil | Soil Depletion by Crops Grown | Types of Soil Conservation Techniques | Flooding | Slope of Land | Timber | Unified or Segmented | Conditions of All Buildings and other fixed improvements | Availability, type of transportation facilities; proximity to markets |
|---|---|---|---|---|---|---|---|---|---|
| SUBJECT #1 - Egypt | Sandy Clay – post oak black belt transition | insignificant | select cut | periodic | flat | hardwood – pine mix | unified w/ logging roads | None | Access to secondary roads and reasonable access to markets |
| LEASED TRACTS: | | | | | | | | | |
| 1) Allen (March Lease) | Sandy Clay – post oak black belt transition | insignificant | clear cut and replant | periodic | flat | hardwood – pine mix | unified w/ logging roads | No significant structure (camp house) | Access to secondary roads and reasonable access to markets |
| 2) Clarence L. Rogers (April Lease) | Sandy Clay – post oak black belt transition | insignificant | clear cut and replant | periodic | flat | hardwood – pine mix | unified w/ logging roads | None | Access to secondary roads and reasonable access to markets |
| 3) Richardson (September Lease) | Sandy Clay – post oak black belt transition | insignificant | clear cut and replant | periodic | flat | hardwood – pine mix | unified w/ logging roads | None | Access to secondary roads and reasonable access to markets |
| 4) C.L. Rogers (September Lease) | Sandy Clay – post oak black belt transition | insignificant | clear cut and replant | periodic | flat | hardwood – pine mix | unified w/ logging roads | None | Access to secondary roads and reasonable access to markets |
| 5) B. Rogers (September Lease) | Sandy Clay – post oak black belt transition | insignificant | clear cut and replant | periodic | flat | hardwood – pine mix | unified w/ logging roads | None | Access to secondary roads and reasonable access to markets |

1) Allen Tract lease refers to Barnes A. Rogers and his wife, Carrie J. Rogers, Clarence Long Rogers, a widow, Janie R. Allen, a widow, Elizabeth R. Sledge, a widow, and C. M. A.  Rogers III, Ellen Rogers Worsham and Jane Rogers Guthries, Trustees under the Last Will and Testament of C. M.A. Rogers, deceased.

2) Clarence L. Rogers (April Lease) Tract lease refers to Barnes A. Rogers and his wife, Carrie J. Rogers, and Clarence Long Rogers, a widow.

3) Richardson Tract refers to Robert Richardson and Kathleen Richardson, his wife and Sandra Moore and Paul D. Moore, her husband.

4) Clarence Long Rogers (September Lease) lease refers to Clarence Long Rogers, a widow.

5) Barnes A. Rogers (September Lease) lease refers to Barnes A. Rogers and his wife, Carrie J. Rogers.

Appendix 2
SUBJECT PROPERTY #2 - "LANFORD A PLACE"

| FACTORS: | Similarity of Soil | Soil Depletion by Crops Grown | Types of Soil Conservation Techniques | Flooding | Slope of Land | Timber | Unified or Segmented | Conditions of All Buildings and other fixed improvements | Availability, type of transportation facilities; proximity to markets |
|---|---|---|---|---|---|---|---|---|---|
| **SUBJECT #2 - Lanford A Place** | Sandy Clay - post oak black belt transition | insignificant | select cut | periodic | flat | hardwood - pine mix | unified w/ logging roads | No significant structure (camp house) | Access to secondary roads and reasonable access to markets |
| **LEASED TRACTS:** | | | | | | | | | |
| 1) Allen (March Lease) | Sandy Clay - post oak black belt transition | insignificant | clear cut and replant | periodic | flat | hardwood - pine mix | unified w/ logging roads | No significant structure (camp house) | Access to secondary roads and reasonable access to markets |
| 2) Clarence L.       Rogers (April Lease) | Sandy Clay - post oak black belt transition | insignificant | clear cut and replant | periodic | flat | hardwood - pine mix | unified w/ logging roads | None | Access to secondary roads and reasonable access to markets |
| 3) Richardson (September Lease) | Sandy Clay - post oak black belt transition | insignificant | clear cut and replant | periodic | flat | hardwood - pine mix | unified w/ logging roads | None | Access to secondary roads and reasonable access to markets |
| 4) C.L. Rogers (September Lease) | Sandy Clay - post oak black belt transition | insignificant | clear cut and replant | periodic | flat | hardwood - pine mix | unified w/ logging roads | None | Access to secondary roads and reasonable access to markets |
| 5) B. Rogers (September Lease) | Sandy Clay - post oak black belt transition | insignificant | clear cut and replant | periodic | flat | hardwood - pine mix | unified w/ logging roads | None | Access to secondary roads and reasonable access to markets |

1) Allen Tract lease refers to Barnes A. Rogers and his wife, Carrie J. Rogers, Clarence Long Rogers, a widow, Janie R. Allen, a widow, Elizabeth R. Sledge, a widow, and C. M. A.  Rogers III, Ellen Rogers Worsham and Jane Rogers Guthries, Trustees under the Last Will and Testament of C. M.A. Rogers, deceased.
2) Clarence L. Rogers (April Lease) Tract lease refers to Barnes A. Rogers and his wife, Carrie J. Rogers, and Clarence Long Rogers, a widow.
3) Richardson Tract refers to Robert Richardson and Kathleen Richardson, his wife and Sandra Moore and Paul D. Moore, her husband.
4) Clarence Long Rogers (September Lease) lease refers to Clarence Long Rogers, a widow.
5) Barnes A. Rogers (September Lease) lease refers to Barnes A. Rogers and his wife, Carrie J. Rogers.

Appendix 3
SUBJECT PROPERTY #3 - "LANFORD B PLACE"

| FACTORS: | Similarity of Soil | Soil Depletion by Crops Grown | Types of Soil Conservation Techniques | Flooding | Slope of Land | Timber | Unified or Segmented | Conditions of All Buildings and other fixed improvements | Availability, type of transportation facilities; proximity to markets |
|---|---|---|---|---|---|---|---|---|---|
| **SUBJECT #3 - Lanford B** | Sandy Clay – post oak black belt transition | insignificant | select cut | periodic | flat | hardwood – pine mix | unified w/ logging roads | None | Access to secondary roads and reasonable access to markets |
| **LEASED TRACTS:** | | | | | | | | | |
| 1) Allen (March Lease) | Sandy Clay – post oak black belt transition | insignificant | clear cut and replant | periodic | flat | hardwood – pine mix | unified w/ logging roads | No significant structure (camp house) | Access to secondary roads and reasonable access to markets |
| 2)Clarence L. Rogers (April Lease) | Sandy Clay – post oak black belt transition | insignificant | clear cut and replant | periodic | flat | hardwood – pine mix | unified w/ logging roads | None | Access to secondary roads and reasonable access to markets |
| 3)Richardson (September Lease) | Sandy Clay – post oak black belt transition | insignificant | clear cut and replant | periodic | flat | hardwood – pine mix | unified w/ logging roads | None | Access to secondary roads and reasonable access to markets |
| 4)C.L. Rogers (September Lease) | Sandy Clay – post oak black belt transition | insignificant | clear cut and replant | periodic | flat | hardwood – pine mix | unified w/ logging roads | None | Access to secondary roads and reasonable access to markets |
| 5)B. Rogers (September Lease) | Sandy Clay – post oak black belt transition | insignificant | clear cut and replant | periodic | flat | hardwood – pine mix | unified w/ logging roads | None | Access to secondary roads and reasonable access to markets |

1) Allen Tract lease refers to Barnes A. Rogers and his wife, Carrie J. Rogers, Clarence Long Rogers, a widow, Janie R. Allen, a widow, Elizabeth R. Sledge, a widow, and C. M. A.  Rogers III, Ellen Rogers Worsham and Jane Rogers Guthries, Trustees under the Last Will and Testament of C. M.A. Rogers, deceased.
2) Clarence L. Rogers (April Lease) Tract lease refers to Barnes A. Rogers and his wife, Carrie J. Rogers, and Clarence Long Rogers, a widow.
3) Richard Tract refers to Robert Richardson and Kathleen Richardson, his wife and Sandra Moore and Paul D. Moore, her husband.
4) Clarence Long Rogers (September Lease) refers to Clarence Long Rogers, a widow.
5) Barnes A. Rogers (September Lease) lease refers to Barnes A. Rogers and his wife, Carrie J. Rogers.

Appendix 4
SUBJECT PROPERTY #4 - "WOODWARD PLACE"

| FACTORS: | Similarity of Soil | Soil Depletion by Crops Grown | Types of Soil Conservation Techniques | Flooding | Slope of Land | Timber | Unified or Segmented | Conditions of All Buildings and other fixed improvements | Availability, type of transportation facilities; proximity to markets |
|---|---|---|---|---|---|---|---|---|---|
| **SUBJECT #3 - Woodward** | Sandy Clay – post oak black belt transition | insignificant | select cut | periodic | flat | hardwood – pine mix | unified w/ logging roads | No significant structure (camp house) | Access to secondary roads and reasonable access to markets |
| **LEASED TRACTS:** | | | | | | | | | |
| 1) Allen (March Lease) | Sandy Clay – post oak black belt transition | insignificant | clear cut and replant | periodic | flat | hardwood – pine mix | unified w/ logging roads | No significant structure (camp house) | Access to secondary roads and reasonable access to markets |
| 2) Clarence L. Rogers (April Lease) | Sandy Clay – post oak black belt transition | insignificant | clear cut and replant | periodic | flat | hardwood – pine mix | unified w/ logging roads | None | Access to secondary roads and reasonable access to markets |
| 3) Richardson (September Lease) | Sandy Clay – post oak black belt transition | insignificant | clear cut and replant | periodic | flat | hardwood – pine mix | unified w/ logging roads | None | Access to secondary roads and reasonable access to markets |
| 4) C.L. Rogers (September Lease) | Sandy Clay – post oak black belt transition | insignificant | clear cut and replant | periodic | flat | hardwood – pine mix | unified w/ logging roads | None | Access to secondary roads and reasonable access to markets |
| 5) B. Rogers (September Lease) | Sandy Clay – post oak black belt transition | insignificant | clear cut and replant | periodic | flat | hardwood – pine mix | unified w/ logging roads | None | Access to secondary roads and reasonable access to markets |

1) Allen Tract lease refers to Barnes A. Rogers and his wife, Carrie J. Rogers, Clarence Long Rogers, a widow, Janie R. Allen, a widow, Elizabeth R. Sledge, a widow, and C. M. A. Rogers III, Ellen     Rogers Worsham and Jane Rogers Guthries, Trustees under the Last Will and Testament of C. M.A. Rogers, deceased.
2) Clarence L. Rogers (April Lease) Tract lease refers to Barnes A. Rogers and his wife, Carrie J. Rogers, and Clarence Long Rogers, a widow.
3) Richardson Tract lease refers to Robert Richardson and Kathleen Richardson, his wife and Sandra Moore and Paul D. Moore, her husband.
4) Clarence Long Rogers (September Lease) lease refers to Clarence Long Rogers, a widow.
5) Barnes A. Rogers (September Lease) lease refers to Barnes A. Rogers and his wife, Carrie J. Rogers.

Appendix 5
SUBJECT PROPERTY #5 - "PATTERSON PLACE"

| FACTORS: | Similarity of Soil | Soil Depletion by Crops Grown | Types of Soil Conservation Techniques | Flooding | Slope of Land | Timber | Unified or Segmented | Conditions of All Buildings and other fixed improvements | Availability, type of transportation facilities; proximity to markets |
|---|---|---|---|---|---|---|---|---|---|
| **SUBJECT #5 - Patterson** | Sandy Clay - post oak black belt transition | insignificant | select cut | periodic | flat | hardwood - pine mix | unified w/ logging roads | None | Access to secondary roads and reasonable access to markets |
| **LEASED TRACTS:** | | | | | | | | | |
| 1)Allen (March Lease) | Sandy Clay - post oak black belt transition | insignificant | clear cut and replant | periodic | flat | hardwood - pine mix | unified w/ logging roads | No significant structure (camp house) | Access to secondary roads and reasonable access to markets |
| 2) Clarence L. Rogers (April Lease) | Sandy Clay - post oak black belt transition | insignificant | clear cut and replant | periodic | flat | hardwood - pine mix | unified w/ logging roads | None | Access to secondary roads and reasonable access to markets |
| 3) Richardson (September Lease) | Sandy Clay - post oak black belt transition | insignificant | clear cut and replant | periodic | flat | hardwood - pine mix | unified w/ logging roads | None | Access to secondary roads and reasonable access to markets |
| 4) C.L. Rogers (September Lease) | Sandy Clay - post oak black belt transition | insignificant | clear cut and replant | periodic | flat | hardwood - pine mix | unified w/ logging roads | None | Access to secondary roads and reasonable access to markets |
| 5) B. Rogers (September Lease) | Sandy Clay - post oak black belt transition | insignificant | clear cut and replant | periodic | flat | hardwood - pine mix | unified w/ logging roads | None | Access to secondary roads and reasonable access to markets |

1) Allen Tract lease refers to Barnes A. Rogers and his wife, Carrie J. Rogers, Clarence Long Rogers, a widow, Janie R. Allen, a widow, Elizabeth R. Sledge, a widow, and C. M. A.  Rogers III, Ellen Rogers Worsham and Jane Rogers Guthries, Trustees under the Last Will and Testament of C. M.A. Rogers, deceased.
2) Clarence L. Rogers (April Lease) Tract lease refers to Barnes A. Rogers and his wife, Carrie J. Rogers, and Clarence Long Rogers, a widow.
3) Richardson Tract lease refers to Robert Richardson and Kathleen Richardson, his wife and Sandra Moore and Paul D. Moore, her husband.
4) Clarence Long Rogers (September Lease) lease refers to Clarence Long Rogers, a widow.
5) Barnes A. Rogers (September Lease) lease refers to Barnes A. Rogers and his wife, Carrie